IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>KHALIL HALLEY | CRIMINAL ACTION<br><br>NO. 24-356-KSM-1 |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                                                          **March 24, 2025**

Defendant Khalil Halley has been charged with possession of a firearm and ammunition after previously being convicted of a crime punishable by more than a year imprisonment, in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 1.) He now moves to suppress the evidence on which the charge is based, arguing that the firearm and ammunition seized were obtained by means of an illegal search and seizure. (Doc. No. 24.)

The Court held an evidentiary hearing on Halley's motion to suppress on March 11, 2025. (*See* Doc. No. 31.) During the hearing, Special Agent James Hughes of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives, Philadelphia Police Department Officer Michael Wolf, and Defendant testified. The Government also presented Officer Wolf's body camera footage (Gov't Hr'g Ex. 4), his certificate of training in auto theft and vehicle crimes (Gov't Hr'g Ex. 3), a Philadelphia Police Department property receipt for the firearm seized by Officer Wolf (Gov't Hr'g Ex. 5), photos depicting the area where Officer Wolf's search and seizure and the events precipitating that search and seizure occurred (Gov't Hr'g Exs. 2-A–2-E; Def's Hr'g Ex. 7), and a map of that area (Gov't Hr'g Ex. 1).

For the reasons discussed below, the Court denies Halley's motion.

I.      **FACTUAL BACKGROUND**

On March 6, 2024, Officers Michael Wolf and Christopher Jones were on a routine patrol in the 24th District[1] when they observed an unoccupied blue Dodge Charger with a paper California "dealer" license plate parked on the 1300 block of East Carrey Street. (Hr'g Tr. 33:15–19, 34:8–12, 41:2–13.) The Officers performed a records check of the vehicle using both the paper license plate number and the vehicle identification number ("VIN") located on the windshield. (*Id.* 41:9–43:7.) The records check of the license plate number did not return any information, but the check of the VIN indicated that the vehicle had been reported stolen. (*Id.*) Before the Officers could take any further action, however, they were called to respond to a different scene. (*Id.* 43:8–18.)

The next evening, while on patrol in the 24th District, the Officers again saw the same Dodge Charger parked behind a multi-unit residence[2] on the 1800 block of East Glenwood Avenue. (*Id.* 44:5–24, 51:14–16.) They observed the sole occupant of the vehicle, later determined to be Halley, exit the driver's seat, at which point the Officers pulled over in their marked vehicle near the parked Dodge Charger. (*Id.* 45:4–6, 46:25–47:10, 47:17–48:7, 67:16–24.) Halley entered one of the gated entrances to the common backyard area of the multi-unit residence. (Gov't Hr'g Ex. 4 at 1:40:11–1:40:32; Hr'g Tr. 50:19–51:9, 69:21–71:17.) This

---

[1] The 24th District encompasses the 1300 block of East Carrey Street, where the Officers first observed the parked Dodge Charger on March 6, the 1800 block of East Glenwood Avenue, where the Officers then observed the parked Dodge Charger on March 7, as well as the 3600 block of Kensington Avenue. (Mar. 11, 2025 Hr'g Tr. ("Hr'g Tr.") 40:21–41:7, 44:5–45:3, 47:4–10.)

[2] The front of this two-story property has two addresses, 3601 and 3603 Kensington Avenue. (Gov't Hr'g Exs. 2-A–2-E; Hr'g Tr. 9:20–11, 12:1–20; *see id.* 13:18–14:1.) 3601 Kensington Avenue is a part-commercial, part-residential building—the first story is occupied by a clothing store, while the second story appears to be a residence, based on the mailbox affixed to one of the gated doors in the fence enclosing the backyard of the property labeled "3601 Kensington Avenue 2nd Floor Apt. 'Diaz / Rodriguez.'" (Gov't Hr'g Exs. 2-A, 2-C–2-E; Hr'g Tr. 15:14–17:1.) 3603 Kensington Avenue appears to be a residential building, comprised of at least one residential unit. (Gov't Hr'g Exs. 2-B–2-D.)

backyard area is enclosed by a metal chain-link fence partially covered by a black tarp that has two separate gated doors, each featuring a doorknob with a keyhole. (Gov't Hr'g Exs. 2-C–2-E; Hr'g Tr. 69:21–71:17, 77:3–8.).[3] Meanwhile, the Officers exited their car and ordered Halley to stop. (Gov't Hr'g Ex. 4 at 1:40:11–1:40:32; Hr'g Tr. 47:21–48:7, 50:19–51:9, 51:21–52:6, 73:24–74:13.) Halley ignored them and attempted to enter the back door of a residence on the ground floor, but he was unable to do so because the door was locked. (*Id.*) The Officers continued to yell at Halley from the sidewalk, instructing him to stop and come out from the enclosed backyard to meet with them. (Gov't Hr'g Ex. 4 at 1:40:11–1:40:43; *see* Hr'g Tr. 71:3–17.) But Halley remained there, pacing and, at one point, walking up the steps of the fire escape, while yelling at an occupant within the residence to let him inside. (Gov't Hr'g Ex. 4 at 1:40:11–1:41:09; Hr'g Tr. 53:7–16, 56:3–18, 77:25–78:4.)

Halley walked to a corner of the backyard, and, with his back turned away from the Officers, he appeared to reach for his waistband. (Gov't Hr'g Ex. 4 at 1:40:32–1:40:50; Hr'g Tr. 51:21–52:16.) Officer Wolf then heard and saw Halley discard something from his waistband that sounded like a heavy metal object when it hit the ground. (Gov't Hr'g Ex. 4 at 1:40:32–1:40:50; Hr'g Tr. 51:21–52:10, 54:3–15, 55:16–56:10.) Officer Wolf immediately radioed that he believed that Halley had just discarded a firearm. (Gov't Hr'g Ex. 4 at 1:40:32–1:40:50; Hr'g Tr. 53:19–54:2.) A few seconds later, Halley returned to the back door of the building, appeared to use a key to enter a residence on the ground floor, and immediately shut the door. (Gov't Hr'g Ex. 4 at 1:40:50–1:41:15; Hr'g Tr. 56:11–21, 80:9–12.) Anticipating that Halley would run out the front door of the residence, Officer Jones ran toward the other side of the property on Kensington Avenue. (Gov't Hr'g Ex. 4 at 1:41:15–1:42:02; *see* Hr'g Tr. 56:22–57:21.) As

---

[3] The rear side of 3601 and 3603 Kensington Avenue has at least three doors with access to this backyard. (Gov't Hr'g Exs. 2-C–2-E; Hr'g Tr. 21:2–23:3.)

anticipated, Halley ran out the front door of 3603 Kensington Avenue, and Officer Jones began chasing him. (*Id.*) Officer Jones and several backup officers apprehended and arrested Halley several blocks later. (*See* Hr'g Tr. 56:22–57:21, 61:14–20.)

Meanwhile, Officer Wolf initially ran behind Officer Jones but stopped at the corner of East Glenwood Avenue to call for backup. (Gov't Hr'g Ex. 4 at 1:41:15–1:42:02; *see* Hr'g Tr. 56:22–57:21.) He then returned to the 1800 block of East Glenwood Avenue and entered the backyard of the property by climbing the metal fence. (Gov't Hr'g Ex. 4 at 1:41:15–1:42:53; *see* Hr'g Tr. 57:17–58:7, 63:19–23, 71:8–17.) After searching the area for nearly 45 seconds, Officer Wolf observed a firearm on the ground where he had previously heard and seen Halley discard what had sounded like a heavy metal object. (Gov't Hr'g Ex. 4 at 1:42:01–1:45:45; Hr'g Tr. 58:24–59:25.) He waited for backup officers before recovering the firearm, a Smith & Wesson, model 5906, 9 mm caliber semi-automatic pistol, bearing serial number VYZ9792, loaded with 10 rounds of live ammunition. (*Id.*) The Philadelphia Police Department also seized the Dodge Charger. (Hr'g Tr. 62:19–23.)

According to Halley, on the night of March 7, 2024, he was living at his girlfriend's apartment at 3603 Kensington Avenue. (*Id.* 83:2–84:5.) He kept personal items, including clothes and toiletries, at this apartment. (*Id.* 84:6–12.) Halley claimed that he and his girlfriend shared one set of keys to the apartment, which he had in his possession on the night of March 7. (*Id.* 84:13–19.) As of that night, Halley had been living at this apartment for approximately six months. (*Id.* 85:10–11.) Although the Philadelphia Police Department property receipt for the

4

firearm seized by Officer Wolf lists "909 N. Marvine" as Halley's address,[4] Halley testified that he was not living anywhere else on March 7, 2024. (*Id.* 85:4–9.)

## II. THE PARTIES' ARGUMENTS

Halley argues that his Fourth Amendment rights were violated by Officer Wolf's warrantless search of the enclosed backyard behind 3603 Kensington Avenue and the resulting seizure of Halley's discarded firearm. (*See generally* Doc. No. 24.) Halley claims that as an overnight guest at this residence,[5] he had a reasonable expectation of privacy in both the unit in which his girlfriend resides and the common backyard behind the unit, which he contends is constitutionally protected curtilage, i.e., the area immediately surrounding and associated with the residence. (*Id.* at 7–11.) Halley further argues that no exigent circumstances justified Officer Wolf's warrantless search. (*Id.* at 11–12.) Accordingly, Halley moves for the suppression of the loaded firearm that was obtained through this search. (*See generally id.*)

In response, the Government contends that Halley did not have a reasonable expectation of privacy in the backyard because it is a common area of a multi-unit building. (Doc. No. 27 at 6–10.) But even if Halley did have a reasonable expectation of privacy in the backyard, the Government claims that as an overnight guest, he relinquished that expectation of privacy when he left the premises. (*Id.* at 10–11.) Alternatively, if the Court determines that Halley had a privacy interest in the backyard—and as such, has standing to challenge Officer Wolf's warrantless search—the Government argues that the search was justified by probable cause that

---

[4] Officer Wolf testified that Halley gave 909 N. Marvine as his address to the Philadelphia Police Department, which the Department then cross-checked in its system. (*Id.* 60:2–18.) Halley also confirmed that this is the address listed for him with the "DMV." (*Id.* 85:15–17.)

[5] Though Halley argues in his motion that he has an expectation of privacy as an overnight guest at 3603 Kensington Avenue, Halley's testimony and argument at the hearing on the motion seemed to focus on Halley's expectation of privacy as a resident of 3603 Kensington Avenue. (*Compare* Doc. No. 24 at 4 *with* Hr'g Tr. 83:2–84:5, 93:23–94:16.)

the backyard contained evidence of a crime (a discarded firearm belonging to an occupant of a stolen vehicle) and exigent circumstances (a discarded firearm potentially accessible by others, including possible children that may live within the multi-unit residence and a criminal suspect who had not yet been detained). (*Id.* at 11–14.)

III.     **LEGAL STANDARD**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To invoke this protection, a defendant challenging a search or seizure through a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated. *See United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011); *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010). This requires the defendant to prove that he has "an actual or subjective expectation of privacy in the subject of the search or seizure" and "this expectation of privacy is objectively justifiable under the circumstances." *Free Speech Coalition, Inc. v. Att'y Gen. of the U.S.*, 677 F.3d 519, 543 (3d Cir. 2012); *see Minnesota v. Olson*, 495 U.S. 91, 95–96 (1990) ("[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment had a legitimate expectation of privacy in the invaded place. A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable." (internal quotations and citations omitted)).

Once the defendant has established standing to bring his Fourth Amendment challenge, the burden shifts to the government to show that the challenged search or seizure was reasonable. *See Correa*, 653 F.3d at 190; *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). A warrantless search or seizure is "presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion." *United States v. Coles*,

437 F.3d 361, 365 (3d Cir. 2006). "Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others. In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." *Id.* at 366 (internal citations omitted).

IV.     **DISCUSSION**

As further explained below, the Court finds that Halley does not have standing to challenge the search of the enclosed backyard behind 3603 Kensington Avenue. While Halley has established that he was at least an overnight guest entitled to a reasonable expectation of privacy within his girlfriend's residence at 3603 Kensington Avenue, this expectation of privacy did not extend to the enclosed backyard behind that residence because it is a common area accessible to all tenants of a multi-unit building. The shared backyard is not, as Halley contends, curtilage of 3603 Kensington Avenue subject to Fourth Amendment protection.[6]

First, the Court finds that Halley has established that on March 7, 2024, he was at least an overnight guest entitled to a reasonable expectation of privacy in 3603 Kensington Avenue. *See United States v. Cortez-Dutrieville*, 743 F.3d 881, 884 (3d Cir. 2014) ("Generally, a person's 'status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.'" (quoting *Olson*, 495 U.S. at 96–97)). Halley testified that he had been staying at this residence for the last six months, that he kept personal items there, and that he had access to a set of the keys to the residence. Plus, Officer Wolf's body camera footage and testimony confirm that Halley possessed and used the keys to

---

[6] Because the Court finds that Halley does not have standing to challenge Officer Wolf's search of the backyard and seizure of his discarded firearm, the Court need not determine whether Halley relinquished his expectation of privacy when he fled the premises or whether probable cause and exigent circumstances justified the search.

7

that residence on March 7, 2024. Together, this evidence is sufficient to prove that Halley maintained a reasonable expectation of privacy in 3603 Kensington Avenue. *See United States v. Wright*, No. 17-cr-228, 2021 WL 2373726, at *8 (W.D. Pa. June 10, 2021) (finding that defendant met his burden to establish standing as an overnight guest based on evidence that defendant kept prescription medicines and clothes at the home in question and defendant possessed the keys to two cars parked directly outside of the home).

However, Halley's expectation of privacy did not extend to the backyard behind 3603 Kensington Avenue, which, by virtue of being a shared area, does not constitute constitutionally protected curtilage. Curtilage, or "the area immediately surrounding and associated with the home," is considered "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (internal quotations omitted). "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987). These factors include, but are not limited to: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301. However, the weight of these factors "is diminished further as applied to apartment dwellings." *United States v. Acosta*, 965 F.2d 1248, 1256 (3d Cir. 1992). Indeed, the Third Circuit, acknowledging "the *Dunn* factors are not as useful analytically" in the context of apartment buildings, has instead focused the curtilage inquiry in this context on the nature of the control over and access to the area in question. *Id.* at 1256–57; *Correa*, 653 F.3d at 190–91.

In so doing, the Third Circuit has held that common areas of multi-unit buildings do not qualify as constitutionally protected curtilage, and thus there is no reasonable expectation of privacy in such areas. *See Correa*, 653 F.3d at 191–92 ("[A] resident lacks an objectively reasonable expectation of privacy in the common areas of a multi-unit apartment building with a locked exterior door."); *Acosta*, 956 F.2d at 1253, 1256–57 (holding that a resident of a multi-unit apartment building lacks an objectively reasonable expectation of privacy in the common areas of the building secured by an unlocked exterior door, like the hallway and backyard); *United States v. Hoover*, 857 F. App'x 721, 722 (3d Cir. 2021) ("[W]e have squarely held that a resident in a multi-unit building does not have a reasonable expectation of privacy in common areas of the building."). This is because residents of a multi-unit building lack exclusive control over these common areas. *See Correa*, 653 F.3d at 191 ("After all, an expectation of privacy necessarily implies an expectation that one will be free of *any* intrusion, not merely unwarranted intrusions." (internal quotations omitted)). There are a "plethora of individuals who could access the common areas," even when they are secured by a locked door, since "any resident in the multi-unit apartment building could admit guests, delivery people, repair workers, postal carriers, custodians, and others" into those common areas. *See id.*; *United States v. Davis*, No. 18-cr-641, 2022 WL 5242284, at *3–4 (D.N.J. Oct. 6, 2022) (finding that the fenced outdoor area surrounding the multi-unit building where defendant resides, including the front porch, is not curtilage protected by the Fourth Amendment because, among other reasons, "there is no indication that [d]efendant had exclusive access to this area" and defendant conceded that other residents used the front porch).

Halley concedes that "this Circuit has repeatedly held that residents of multi-unit dwellings have diminished privacy expectations in common areas." (Doc. No. 24 at 9.)

Nevertheless, he attempts to distinguish the enclosed backyard at issue here from a common area in a multi-unit dwelling based on the following features: (1) only two other families share access to the backyard;[7] (2) the fence surrounding the backyard is "more akin to a security fence that prevents access to the back door and provides a barrier against uninvited and/or unwanted visitors"; and (3) the fence requires a key for access "and was therefore an extension of the backdoor entryway."[8]  (*Id.* at 9–11.)  The Court is not persuaded.

Despite Halley's argument to the contrary, it is the lack of exclusive access to a given area of a multi-unit residence that renders the area "common" and voids any expectation of privacy in that area.  *See Correa*, 653 F.3d at 191; *Acosta*, 965 F.2d at 1252, 1257; *cf. United States v. Matthews*, 597 F. Supp. 3d 694, 707–08 (D.N.J. 2022) (granting motion to suppress evidence of marijuana seized from the detached garage of defendant's multi-unit apartment building where there was no showing that "the tenants shared access to the garage or admitted others to the garage" or that the garage was "barred only to outsiders").  Accordingly, Halley's admission and the photo and body camera evidence that multiple residents share access to the backyard in question are dispositive of the common area inquiry.  The extent of that non-exclusive access—i.e., the residents of only one or two other units in addition to the residents of 3603 Kensington Avenue—does not change the analysis.

---

[7] Although the evidence presented at the evidentiary hearing did not definitively establish that there were three residential units with access to the backyard, Halley conceded that the backyard is "common to whoever has access to it through those [two or three] apartments." (Hr'g Tr. 95:25–96:5, 101:8–15.)

[8] During the evidentiary hearing, Halley further attempted to distinguish this backyard by arguing that the structure of the building and the layout of the backyard are such that there is a clear delineation between the areas behind 3601 and 3603 Kensington Avenue, even though no fence divides them—equating the backyard to a "shared driveway." (Hr'g Tr. 97:21–99:11.)  Under this theory, Halley would have an expectation of privacy limited to the portion of the backyard immediately behind 3603 Kensington Avenue.  Even if the Court accepted this theory, Halley's argument would still fail because he discarded his firearm in the backyard behind *3601* Kensington Avenue.

Nor does the fact that backyard is enclosed by a locked chain-link fence "akin to a security fence." In *Acosta*, the Third Circuit rejected the defendants' argument that a fenced-in backyard of a multi-unit building was part of their first-floor apartment's curtilage because the landlord and his employees used the backyard in addition to defendants. 965 F.2d at 1257. Extending its holding in *Acosta*, the Third Circuit then held in *Correa* that "the presence of a locked exterior door does not alter" the lack of objectively reasonable expectation of privacy in the common areas of a multi-unit apartment building, as the "purpose of the locked front door was to provide security to the occupants, not privacy in [the] common areas." 653 F.3d at 188, 191 (internal quotations omitted).

In sum, the Court finds that Halley did not have a reasonable expectation of privacy in the common backyard behind 3603 Kensington Avenue. Accordingly, Halley does not have standing to challenge Officer Wolf's search of that area and resulting seizure of Halley's discarded firearm.

V.     **CONCLUSION**

For the reasons set forth above, the Court denies Halley's motion to suppress. An appropriate Order follows.